[Civ. No. 4646. Fourth Dist. Feb. 24, 1954.]

LEO COFFENBERRY, Appellant, v. MYRON B. LEVI et al., Respondents.

Van Dyke & Shaw and James C. Van Dyke for Appellant.

William M. Martin for Respondents.

BARNARD, P. J.—This action arose out of the construction of certain houses on lots owned by the defendants. In December, 1950, an "Owner-Contractor Agreement" was entered into by Myron B. Levi and C. M. Maaskant as "Owner" and

Richard Goodenough, Robert Goodenough and Dick B. Williams as ''Contractor,'' for the erection of houses on these lots.

This contract provided that the ''Contractor'' agreed to provide all labor and material, to construct one house, and to construct additional houses ''when and as Owner so notifies Contractor,'' all in accordance with certain specifications. It was further provided that before such additional units should be commenced, contracts for the sale of the houses by the owner to third parties must have been entered into, with down payments deposited in escrows placed with the Security Title Company; that the owner would make every reasonable effort to thus sell the units contemplated as soon as possible, such sales to be made at a minimum price of $8,950; and that ''only Owner shall have the right to sell said units, and that the rights of the Contractor herein are only those of an independent contractor engaged in the construction thereof.'' The owner agreed to pay the contractor ''as full compensation for Contractor services hereunder, in the manner and amounts hereinafter set forth, to wit:'' It was then provided that a ''Building Account'' should be started in a Hanford bank in the joint names of the ''Owner'' and ''Contractor''; that no withdrawal should be made without the signature of one of the owners and one of the contractors; that the owner should secure construction loans on the various units and deposit the proceeds in this building account; that the owner should deposit in said building account all sums received from the sale of houses ''as and when escrows are terminated''; and that, in the event the building account proved insufficient, the owner was to deposit into the building account a sufficient amount to cover construction costs, provided that the owner should not be required to deposit more than $1,000 for the cost of any one house.

It was then provided that the owner should pay, from this building fund, for all materials and labor supplied by the contractor, including wages of the ''contractor'' for actual construction labor performed in the work, by delivering to the contractor checks drawn on this building account signed by either Mr. Levi or Mr. Maaskant, reserving the right in the owner to refuse such payment on any item not incurred in conformance to the terms of the contract; that after the completion of construction of all houses requested by the owner, and the close of all sale escrows, the owner was to pay the contractor all funds remaining in the building account, less any amounts up to $1,000 on each house which had been de-

posited by the owner to make up a deficiency, and less $400 for each house completed; that such sum was to be in full compensation for all contractor's services under the contract; and that "In other words, Owner is guaranteed the amount represented by such formula from the Building Account before any sums are guaranteed Contractor." It was further provided that the title to all work completed and in the course of construction should be in the owner; that the owner should have the right to terminate the contract at any time the contractor violated its terms; that the contractor should have the sole right to hire and fire and to direct all labor and work upon said construction "without any interference of Owner whatsoever"; that "It is understood and agreed that the relationship between the parties hereto is that of Owner and an independent contractor . . . and that the parties hereto are not partners or joint venturers, or employees and employers, or principal and agent," and that neither party shall be responsible for the "Contracts or obligations" of the other.

One house was built and sold in December, 1950, and 12 others were then built and sold through escrow, the proceeds being placed in the building fund. The defendants secured construction loans and deposited the proceeds in the building fund. The defendants, as "Owner," also deposited in the building fund the required $1,000 for each house built, since that became necessary. The building fund was established in a bank under the name of Hanford Construction Company, a fictitious name used for that purpose alone, and bills were paid by checks on that fund, signed by one of the owners and one of the contractors.

In May, 1951, the building fund was exhausted and a labor payroll was due. The owners told the contractors that it was their responsibility to get the money, and the contractors said they would do so. The contractors contacted the plaintiff and borrowed $12,000 from him, promising him a bonus of $200 on each house. On May 18, 1951, they gave Coffenberry a note for $14,400 with interest at 6 per cent, signed by Richard Goodenough and Robert Goodenough. Before completing the loan Coffenberry demanded and received an order on the Security Title Company authorizing the title company to pay to Coffenberry, as credits on this note, all proceeds due to these defendants from the sales of any of these houses, on completion of the respective escrows. This order was signed by the two Goodenoughs and "approved" by these defendants. On May

20, Coffenberry issued a check to the Security Title Company for $6,000 which was endorsed by the title company and by ''Hanford Construction Company, G. M. Levi,'' and deposited in the building fund. On June 11, 1951, Coffenberry issued his check to ''Goodenough Bros.'' for $3,000, which was endorsed by them and placed in the building fund. On July 2, Coffenberry issued his check to ''R. A. Goodenough'' for $3,000, which was endorsed by R. A. Goodenough and deposited in the building fund.

By September, 1951, it became apparent that there would not be sufficient funds in the escrows with the title company to pay the note thus given to Coffenberry, and he brought this action against the owners, without joining the contractors. The amended complaint, in three causes of action, alleged that on May 18, 1951, the defendants were indebted to the plaintiff in the sum of $12,000 for money theretofore loaned them, and which they had orally promised to pay; that on that date the defendants were indebted to the plaintiff in the sum of $12,000 for money theretofore received by the defendants for the use of the plaintiff, and which they had orally promised to pay; and that on that date the defendants were indebted to the plaintiff in the sum of $12,000 for money theretofore expended by the plaintiff for the use of the defendants, at their request, and which they had orally promised to pay. After a long trial the court found, among other things, that none of the material allegations of the complaint were true; that the plaintiff had not loaned any money to the defendants and they were not indebted to him in any amount; that the defendants had not received any sum for the use or benefit of the plaintiff; that the plaintiff had not expended any money for the use of the defendants; that the defendants had not authorized the Goodenoughs to borrow any sum from the plaintiff; that the defendants were not partners or joint venturers with the three contractors, or with any of them; and that no part of the $12,000 was loaned by the plaintiff to the defendants or expended for their use, but that this amount was loaned by the plaintiff to the Goodenoughs. Judgment was entered in favor of the defendants, and the plaintiff has appealed.

The appellant contends that under the rules stated in *Parker* v. *Trefry*, 58 Cal.App.2d 69 [136 P.2d 55], it conclusively appears that this was a joint enterprise between the owner and contractor, and that it follows, as a matter of law, that the respondents are liable for the full amount of the loan made by the appellant to the joint venture. It is argued that

the contract provides that each party shall furnish part of the capital, that they shall have joint control of the finances, and that they shall divide the profits; and that the parties acted as joint adventurers in that they jointly purchased materials and handled the finances, jointly authorized the escrow holder to apply proceeds of the escrows on the note, and placed the $12,000 borrowed from the appellant into the building fund, where it was jointly used to pay the costs of the project. It is further argued that there is no evidence that the appellant knew or even suspected that the Goodenoughs did not have authority to secure this loan and to bind the coadventurers for its payment.

■ The contract itself provides for an owner and contractor relationship rather than for a joint venture. The contractor was to furnish all labor and materials and the owner was to furnish the proceeds of the loans and sales, with a limited amount in addition, if this became necessary. The contractor was obligated to build the houses for the total of these sums. Instead of providing for a division of the profits it was provided that the owner would get a small amount, guaranteed as against the contractor, and the balance, if any, would go to the contractor as payment for his services. Since the owners furnished the lots it would not appear that the $400 per house would give them much, if any profit. The fact that the owners signed checks on the building fund was merely a safeguard to insure proper use of the funds by the contractor.

We find nothing in the evidence as to the actions of the parties which would conclusively disclose a joint venture relationship. There is ample testimony that the contractors hired all labor and procured all materials although a few items were, at their request, purchased for them by the owners, and that the owners had no supervision or control over the construction. Bills incurred by the contractors were paid from the building fund, as provided for in the contract, and only after they were approved by the contractors.

When additional money was needed to pay for materials and labor the contractors recognized that this was their responsibility, and proceeded to get it through the loan in question. While the owners knew that the contractors were obtaining this loan, they neither participated in getting the loan nor signed the note. The order on the title company, which they signed, gave the appellant a priority with respect to certain funds, but did not purport to obligate the re-

spondents to pay the amount of the loan. While this assignment referred to "the proceeds due" to the respondents, these proceeds did not belong to the respondents but were funds which were to go into the building fund, in accordance with the contract. These funds were "due" to the respondents only because they, as sellers, were parties to the escrow. Respondents testified that at the time they approved the assignment they told the contractors that they would not be responsible for the loan, and that they were signing the document solely to give the lender priority with respect to the balance of the escrow funds. The employee of the title company who drew the assignment confirmed this, and testified that the owners approved the assignment at the request of the title company, since it could not act on Goodenough's instruction alone.

There is ample evidence to support the finding that this loan was made solely to the Goodenoughs. The appellant was well acquainted with the Goodenoughs, having made them two previous building loans, and he had never met the respondents prior to the making of this loan. While there is some conflict in this respect, there is evidence that the respondents did not ask the contractors to approach the appellant for a loan, and that the contractors did not mention the respondents' names to the appellant when they applied to him for a loan. On May 20, 1951, the appellant wrote to this title company stating that "in accordance with an agreement between myself and Goodenough Bros." he was enclosing a check for $6,000, which the title company was to deliver to Goodenough Bros., on an acceptance of the order "which they filed with you, and approved by" the respondents. The letter then stated: "The balance of the loan to Goodenough Bros. will be consummated in about 10 days, after I arrive home in Stockton." The appellant testified that he felt he was lending the money only to the respondents, and later said that he was putting the money into respondents' property with the intention that they should use it. He finally stated that when he made the deal with the Goodenoughs he understood that the relation between them and the respondents was one of owner and contractor, and that he made the loan upon the basis that the owner would be obligated to pay the bills. He also testified that he had read the written agreement showing that these parties were owner and contractor "but I didn't rely on that too much"; that before making the loan he had read the part of the agreement limiting the amount to be supplied

by the owners to $1,000 per house but that he considered this "absurd, and I didn't pay any attention to it"; and that he interpreted the contract as requiring the owners to pay all costs of construction, and considered that they would have to pay this loan since it would be a part of the construction costs. He further testified that about six weeks after the loan was made he saw Mr. Levi for the first time, and that Levi then said to him "You will get all of your money, I am the one that is going to lose on this deal." Later on, he testified that Mr. Levi's remarks on that occasion had reference to this fund; that at that time this "was confirmed at the title company"; that "it appeared at that date I would get my money without any difficulty"; and when asked "But Mr. Levi did not tell you that he would pay you; he told you he thought there would be enough in that fund to pay you?", he replied "That is right."

The loan was made to the Goodenoughs and, as far as the respondents are concerned, was payable only from a specific fund. In the interest of brevity we have not discussed several evidentiary matters relied on by the appellant, since they are merely a part of such conflict as appears in the evidence.

If it could be assumed that a part of the evidence was sufficient to have supported contrary findings the evidence is amply sufficient to sustain the findings made and it can neither be said, as a matter of law, that a joint venture relationship here existed nor that such a relationship was relied upon by the appellant in making this loan.

The judgment is affirmed.

Griffin, J., and Mussell, J. concurred.